UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

1-800-RADIATOR OF WISCONSIN, LLC,

    Plaintiff,

  v.                                                        Case No. 08-C-362

1-800-RADIATOR FRANCHISE, INC., et al,

    Defendants.

---

**DECISION AND ORDER GRANTING MOTION**
**FOR TEMPORARY RESTRAINING ORDER**

---

Plaintiff 1-800-Radiator of Wisconsin, LLC ("ROW") filed this diversity action on April 29, 2008 alleging that Defendants 1-800-Radiator Franchise, Inc. and its Chief Executive Officer Michael J. Rippey, (collectively "RFI") violated the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 *et seq.*, engaged in fraudulent advertising, and made intentional misrepresentations in connection with the sale of a 1-800-Radiator franchise to Gary and Laurie Young, sole members of 1-800-Radiator of Wisconsin, LLC. In its amended complaint ROW asserted claims for intentional misrepresentation and violations of the Wisconsin Franchise Investment Law, Wis. Stat. § 553.01 *et seq.*; the Wisconsin Fair Dealership Law ("WFDL"), Wis. Stat. § 135.01 *et seq.*; and the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18. Somewhat inconsistently, but what ROW now claims to be alternatively, the amended complaint seeks rescission of the franchise agreement, together with an award of damages, as well as an injunction preventing RFI from terminating and/or substantially changing the competitive circumstances of the franchise in violation of the WFDL.

Following the denial of previous motions for a temporary restraining order and preliminary injunction based in part on counsel's assurances that his client would not terminate the dealership in violation of Wisconsin law, I granted RFI's motion to stay the case and compel ROW to arbitrate the dispute pursuant to the parties' agreement. On September 29, 2008, ROW filed an expedited motion for a temporary restraining order alleging that RFI had terminated its franchise in violation of the WFDL on September 27 on less than twenty-four hours notice. ROW requested an order enjoining RFI from (1) terminating the Plaintiff's franchise; (2) substantially changing the competitive circumstances of the Plaintiff's franchises; and (3) awarding the Plaintiff its actual costs and actual attorney's fees. (Pl.'s R. 7.4 Expedited Non-Dispositive Mot. for TRO at 1.) I lifted the stay and set the matter for a telephonic hearing on September 30, 2008. Now, having considered the arguments of counsel and the record before me, I grant the Plaintiff's motion for a temporary restraining order and direct RFI to reinstate ROW, subject to their posting an appropriate bond.

## BACKGROUND

ROW is a limited liability company operating a franchise under an agreement with RFI, a California corporation located in Benicia, California. ROW is owned and operated by Gary Young and his wife Laurie, both citizens of Wisconsin. RFI has 255 franchisees throughout the U.S. and Canada. In the course of their business, ROW took orders for the purchase of radiators made through RFI's proprietary network and conducted sales calls and visits in their local area.

In September 2007, RFI began investigating the potential acquisition of Automotive Cooling Products ("ACP"), a competitor of RFI in the Midwest. (Aff. Jeff Parrish at ¶ 7.) ROW received notice from RFI on August 14, 2008, that detailed RFI's planned acquisition of ACP. (Decl. of

2

Gary Young at ¶ 2.) RFI anticipated that its acquisition of ACP would result in a sizeable increase of RFI's market share for radiator sales in the Midwest, to include the area of Wisconsin in which ROW operated. RFI planned to add ACP's existing customers to its network on a "go live" date of September 29, 2008. On this date calls from ACP customers would automatically be re-routed to the RFI franchise in that territory. (Aff. Jeff Parrish at ¶ 9.)

On September 9, 2008, RFI contacted Gary Young and outlined what RFI would require of ROW in order to handle the increased business that was anticipated to result from the acquisition of ACP. (Decl. of Gary Young at ¶ 3.) To take on the additional sales from ACP customers that RFI anticipated, Young was informed ROW would be required to increase its inventory by $90,000, add three new employees, obtain two new delivery vehicles, expand its warehouse space, upgrade its computers and telecommunication system, increase advertising and send its employees for additional training. Young was told ROW could either participate in RFI's "goodwill payment program" under which, in return for periodic payments, RFI would provide assistance in meeting the requirements, including payment terms, or ROW could meet the requirements on its own. In the event ROW decided not to participate in the goodwill payment program, Young was told it would be its sole responsibility to meet the additional requirements by the "go live" date of September 29, 2008. (Young Decl. ¶ 3, Ex. 2.)

Young was not provided a copy of the terms of the proposed "goodwill payment program" until September 25, 2008 at 5:59 p.m. At that time, Josh Nicosia, RFI's general counsel, sent Young an e-mail attaching two letters regarding the "ACP Goodwill Agreement" and a "Buyback Commitment." Under the terms of the Goodwill Agreement, ROW was to pay RFI $155,368, an amount equal to 12.5% of the ACP sales RFI projected, in 78 weekly payments of $1,992 beginning

3

December 1, 2008. The Agreement also required ROW to hire any additional employees needed to cover increased sales and "to purchase any additional inventory product lines and inventory amounts as recommended by Franchisor." (*Id.* Ex. 7.) ROW was given until noon Pacific Time on September 26, 2008, less than twenty-four hours, to agree. (*Id.*) ROW did not agree, and at 4:55 p.m. on Friday, September 26, 2008, counsel for ROW received an e-mail from RFI's general counsel with a notice of termination of the franchise. (*Id.*) The notice indicated the termination would be effective as of 5:00 p.m., Saturday, September 27, 2008. (*Id.*)

RFI has since disconnected ROW from its network so that ROW no longer has access to it and cannot receive calls from or service its customers. (*Id.* at ¶ 8.) As a result, ROW has no income. Unless immediate relief is granted, ROW will be unable to make the lease payments for its office and warehouse or service its debt. The Youngs will lose their investment and apparent sole source of income.

## ANALYSIS

The Seventh Circuit has articulated the standards applicable in determining whether injunctive relief is appropriate. The moving party must demonstrate that:

> [I]t has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest."

*St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001)). The first question for

4

my consideration is therefore whether ROW has demonstrated that it is reasonably likely to succeed on the merits.

**A. Likelihood of Success on the Merits**

ROW contends that it is likely to succeed on its claims under the WFDL. Wis. Stat. §§ 135.01, *et seq*. ROW alleges that it has a "dealership" protected by the WFDL and that RFI violated the WFDL by terminating the dealership agreement without good cause. ROW also asserts that RFI failed to provide it 90 days' written notice and 60 days to cure for terminations or substantial changes in competitive circumstances as required under the WFDL. Wis. Stat. § 135.04.

RFI does not dispute ROW's allegation that it violated the WFDL by failing to provide the required notice and opportunity to cure. RFI contends, however, that it had good cause to terminate the dealership and, under the circumstances, its failure to act would have resulted in irreparable harm to RFI. RFI contends that under the terms of the Franchise Agreement and the Franchise Policy Manual, the Youngs were required to either sign the "Goodwill Agreement" or invest their own money to satisfy the requirements RFI had established in order to meet the expected sales increase within the less than twenty-four hour period after they first received a copy of the Agreement. Their failure to do so, RFI contends, constitutes good cause for the termination. RFI further contends that even apart from their failure to meet its requirements for the anticipated increase in sales, the Youngs had essentially abandoned their franchise. According to RFI, the Youngs had failed to make anywhere near the required number of telephone sales calls and in-person sales visits called for in the Policy Manual. Moreover, because one of the remedies ROW is seeking in the underlying lawsuit is rescission of the Franchise Agreement, RFI claims the

5

Youngs have no incentive to invest any time, money or effort to make the franchise a success. Under these circumstances, RFI claims it had no choice but to terminate the franchise so that it would not lose the benefit of the substantial investment it made to purchase ACP.

On the record before me, I find that ROW has demonstrated a strong likelihood of success on the merits. As noted, RFI essentially concedes that it failed to provide the 90-day notice and 60-day opportunity to cure that the WFDL requires. As to that issue, ROW's success is a certainty. But I also reject RFI's contention that it has established good cause for termination and that at most ROW will be out 90 days worth of profit. Regardless of what RFI's Franchise Agreement and Manual may provide, the WFDL prohibits a grantor of a dealership from substantially changing the competitive circumstances without 90 days notice. A demand that the dealer either commit to an additional payment of more than $155,000 over 78 weeks or invest more than $90,000 of its own money in inventory and hire new employees constitutes a substantial change in competitive circumstances. RFI had no right to make such a demand of its dealer without allowing it more time to consider it.

The fact that ROW is seeking rescission as an alternative remedy in its underlying lawsuit does not change the analysis. ROW is also seeking enforcement of its rights under the WFDL. At some point it must elect which remedy it wants, but there is no showing that it has already done so. ROW continues to operate the franchise as RFI's own records demonstrate. Although he may not be making the number of telephone sales calls and in-person visits that RFI contends are required, Gary Young continues to call an average of 25-30 current and prospective customers a day and the franchise has maintained its sales at or above the levels of last year. (Young Decl. ¶ 10.) In the event RFI's sales projections come true, Young may even decide to make the additional investment

6

that RFI is insisting on. But the WFDL gives him more time than twenty-four hours to make that decision. I therefore conclude that the first factor strongly favors ROW.

**B. Irreparable Harm and Comparison of Harm**

The Youngs assert that they have suffered and will continue to suffer irreparable injury if a temporary restraining order is not granted. They draw the Court's attention to the fact that the WFDL itself designates any violation of the statute as "irreparable harm". *See* Wis. Stat. § 135.065 ("In any action brought by a dealer against a grantor under this chapter, any violation of this chapter by the grantor is deemed an irreparable injury to the dealer for determining if a temporary injunction should be issued."). The Youngs also claim that the actions of RFI make it likely they will become insolvent and be put out of business. (Pl.'s R. 7.4 Expedited Non-Dispositive Mot. for TRO at 4.)

RFI contends that the WFDL merely creates a rebuttable presumption of irreparable harm when a violation of the WFDL occurs. (*Id*.) *See S&S Sales Corp. v. Marvin Lumber & Cedar Co.*, 435 F. Supp. 2d 879, 884 (E.D. Wis. 2006). That presumption is, in RFI's view, more than overcome here. RFI anticipates that more than $1 million in ACP customer business will be directed to ROW as a result of its acquisition. If ROW fails to properly service those customers, RFI contends, they will be lost forever. By failing to participate in RFI's Goodwill Payment Program or invest its own money to make the upgrades needed to handle this new business, RFI contends that ROW has guaranteed that it will be unable to do so. Thus, RFI contends that it had to step in and terminate ROW's franchise in order to protect its investment. At most, RFI contends, ROW will lose 90 days of profits it might otherwise have received if it was given the notice required by the WFDL. RFI, on the other hand, stands to lose far more. Moreover, RFI points out that the

7

allegations of its complaint and the fact that ROW is seeking rescission of the Franchise Agreement as relief in the underlying lawsuit demonstrate they are not committed to the franchise.

As to this issue, also, I find in favor of the plaintiff. Loss of one's business can constitute irreparable harm. *See Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir. 1984); *See also Builder's World, Inc. v. Marvin Lumber & Cedar, Inc.*, 482 F. Supp. 2d 1065, 1075 (E.D. Wis. 2007). As things now stand for the Youngs, they are without any ability to conduct their business and are still obligated to service their business debt and lease agreements. The loss of their business would result in their inability to operate within a market they had invested their time and energies, regardless how satisfactory RFI found them. Although it is true that ROW is seeking rescission as an alternative form of relief, RFI opposes such relief and ROW is also seeking enforcement of its rights under the WFDL. The fact that ROW has requested rescission as an alternative form of relief does not preclude it from seeking to enforce the agreement at this stage of the proceeding.

I am also unconvinced that the risk of harm to RFI is as great as it claims. As the parties have explained, incoming calls to 1-800-Radiator within ROW's territory were directed to ROW. If a call was not answered, it is transferred to the RFI calling center. At the time it terminated ROW, RFI redirected all calls from ROW and now handles them through the former ACP store in Appleton. It thus appears that, to the extent ROW would be unable to handle additional sales, RFI is in a position to offer it assistance in order to maintain satisfaction of ACP's former customers. More importantly, if RFI now finds itself in a difficult position, it has only itself to blame. It chose to acquire ACP knowing it had a pre-existing agreement with the Youngs governed by the WFDL. Rather than demand that ROW immediately commit itself to paying it an additional $1,900 per

8

week or invest more than $100,000, RFI could attempt to work with its franchisee in an effort to insure that the anticipated new customers are properly serviced. Finally, the ACP store in Appleton represents only one of seven locations throughout Minnesota, Wisconsin, Illinois and Nebraska where ACP sold automotive parts, and its sales represent a relatively small portion of ACP's approximately $20 million in annual sales.

I thus conclude that while there is some risk of harm to RFI, there is no showing that it would be irreparable or that it cannot be avoided other than by terminating the ROW franchise. The loss of the Youngs' business and their attendant inability to satisfy their business obligations, on the other hand, constitute irreparable injury.

**C. Public Interest**

I conclude that granting injunctive relief in this case would not harm the public interest. There is no indication before me that it would disrupt access by the consumer to the products being sold. A grant of injunctive relief in this case would be consistent with the policies underlying the WFDL in its protection of dealers.

**D. Security Required Under Rule 65(c)**

Under Fed. R. Civ. P. 65(c), injunctive relief cannot be granted without the movant giving security in an amount the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The Seventh Circuit has cautioned that "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883, 888 (7th Cir. 2000). This is because an error in the other direction produces irreparable injury since the damages for an erroneous preliminary

9

injunction cannot exceed the amount of the bond. *Id.* Although RFI has claimed that it will loose "hundreds of thousands of dollars in new business from the ACP customers" if the Youngs are granted relief, such a general estimate will not suffice. RFI has requested a separate hearing to determine the bond amount. Its request will be granted. In the meantime, however, I will direct ROW to post an initial bond in the amount of $25,000 before this order becomes effective. In the event RFI demonstrates a risk of greater harm at the upcoming hearing, the bond will be increased accordingly.

## CONCLUSION

Based upon the submissions of the parties and the reasons set forth above, the Plaintiff's motion for a temporary restraining order is granted, and RFI is directed to reinstate ROW as a 1-800-Radiator Franchisee, subject to the posting of a bond in the amount of $25,000. The Clerk is directed to contact the parties to arrange a hearing forthwith to determine if such amount is sufficient.

**SO ORDERED** this   1st   day of October, 2008.

      s/ William C. Griesbach
William C. Griesbach
United States District Judge